UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Washington Mutual Bank, | Civil No. 05-1422 (JRT/FLN) |
| Plaintiff, | |
| v. | **AMENDED[1] REPORT AND RECOMMENDATION** |
| Chad L. Belville and Lawyers Title Service Corporation, | |
| Defendants. | |

---

Kurt M. Mitchell for Plaintiff.
Defendant Belville appeared *pro se*.
No appearance for Defendant Lawyers Title Services Corporation.

---

**THIS MATTER** came before the undersigned United States Magistrate Judge on May 11, 2007, on Plaintiff's Motion for Summary Judgment [#55].  The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons which follow, this Court recommends Plaintiff's Motion be granted.

I.  **FINDINGS OF FACT**

On April 4, 2001, Defendant Chad Belville incorporated Defendant Lawyers Title Service in the state of Iowa to provide title services in the state of Minnesota.  (Remjeske Aff., Ex. A; Belville Dep. 13-14, July 21, 2006.)  Defendant Belville is the only shareholder, officer, or director

---

[1]After the Report and Recommendation [#74] was issued on June 29, 2007, counsel for Plaintiff contacted the Court to correct an error, which has necessitated this Amended Report and Recommendation.  At the hearing on this matter, Plaintiff's counsel represented that Plaintiff had settled claims with Attorneys Title Guaranty Fund and Attorneys Title Insurance Fund for "two-hundred and sixty," which the Court interpreted as $260.00.  (Report and Recommendation, Docket # 74, 4.)  After the Report and Recommendation [#74] was issued, Plaintiff's counsel informed the Court that the settlement amount was $260,000.00, not $260.00.

of Defendant Lawyers Title Service.  (Belville Dep. 13.)  Defendant Belville was an approved agent of Attorneys Title Guaranty Fund (hereinafter "ATGF") to issue title commitments and sell title insurance on behalf of ATGF in Minnesota.  (Belville Dep. 15-16; 31.)  Defendant Belville retained 70% of the title insurance premium paid and the remaining 30% was sent to ATGF.  (Belville Dep. 43.) Defendant Belville paid for all employee, office, and business expenses relating to the issuance of title insurance from a sole proprietorship he had established in the mid- to late-1990s called Chadwick Enterprises. (Belville Dep. 14.)

In April 2001, Defendant Belville started issuing title commitments and he issued 30 in that month.  (Belville Dep. 38.)  By September 2001, Defendant Belville was issuing over 300 title commitments per month.  (Belville Dep. 38.)  To support his title business, Defendent Belville held thirteen bank accounts in his name, Chadwick Enterprises, or Lawyers Title Service.  (Hengesteg Aff.; Sommervold Aff.)   Eleven of the accounts were through Northwoods State Bank in Northwood, Iowa, and two accounts were through Mainstreet Bank in Forest Lake, Minnesota. (Hengesteg Aff.; Sommervold Aff.)

One of the accounts held in the name of Defendant Lawyers Title Service was Northwoods account number 1005209 (hereinafter "Northwoods 1005209"), which had millions of dollars cycling through it.  (Hengesteg Aff., Ex. B.)   This account held closing funds, which included money from the new mortgage company that would be used to pay the prior mortgage company in a refinancing situation or the seller in home sale situation.  When the balance exceeded five million dollars, the excess would be transferred to an account held by Chadwick Enterprises.  (Belville Dep. 67; Hengesteg Aff., Ex. E.)  When the balance on Northwoods 1005209 fell below five million dollars, money from the Chadwick Enterprise account would be transferred back.  (Belville Dep.

67.)  The purpose of these transfers was to allow Defendant Belville to earn interest on the real estate closing funds he was holding.  (Belville Dep. 68.)  The interest earned was reported by Defendant Belville as personal income.  (Belville Dep. 68.)  In December 2001, Defendant Belville also used this account to borrow $170,000 because he was closing on a townhouse for himself and his financing did not come through in time.  (Belville Dep. 105.)  Defendant Belville repaid the $170,000 to Northwoods 1005209 six weeks later when the financing came through.  (Belville Dep. 105-06.)

In October or November 2001, Defendant Belville attempted to reconcile his various accounts, including Northwoods 1005209, and realized  he did not have the time or knowledge to reconcile them, so he hired an accountant.  (Belville Dep. 81.)  At about the same time he hired the accountant, from November 3, 2001, to November 15, 2001, ten checks bounced that were written on Northwoods 1005209.  (Hengesteg Aff., Ex. B, 155-56.)  Defendant Belville investigated the shortfall and discovered undeposited funding checks as the source of the shortfall.  (Belville Dep. 81.)

In March 2002, Tim and Suzanne Lindquist, refinanced their residential home.  (Nicassio Aff. 2.) The Lindquists' old mortgage was held by Plaintiff.  (Nicassio Aff., Ex. A.)  The Lindquists used Defendant Belville to provide title insurance for their refinancing of their home.  (Nicassio Aff. 2.)  On March 29, 2002, the Lindquists new mortgage was funded and $467,761.61 was deposited in Northwoods 1005209 and, on April 2, 2002, a check for $466,432.46 was written to Plaintiff to satisfy the Lindquists' old mortgage held by Plaintiff.  (Nicassio Aff., Ex. C.)  The check was issued from Northwoods 1005209, an account held by Defendant Lawyers Title Service Corporation, and signed by Defendant Belville.  (Nicasssio Aff. Ex C.)  The check was returned to Plaintiff because

3

Northwoods 1005209 had insufficient funds to cover the check.  (Hengesteg Aff., Ex. B, 237.)

Shortly after the check to Plaintiff was returned, Defendant Belville realized that about one million dollars was missing from his accounts.  (Belville Dep. 113.)  Defendant Belville notified ATGF of the shortage and ATGF sent an investigator from their parent company Attorney's Title Insurance Fund ("ATIF") to meet with Defendant Belville.  The investigator instructed Defendant Belville to liquidate all of his accounts and give the money to ATGF.  (Belville Dep. 116-18.)  ATGF took control of Defendant Belville's money and business records.  (Belville Dep. 116-18.)  ATGF paid all of Defendant Belville's creditors except for the dishonored check to Plaintiff.  Through the investigation of the shortfall, it was discovered that the source of the shortfall was unfunded mortgages being closed. ( Mem. in Opp. to Summary Judgement 3.)

Plaintiff initially brought suit against ATGF, ATIF, Lawyers Title Service and Belville to recover on the dishonored check.  Prior to the current motion for summary judgment, Plaintiff settled claims against ATGF and ATIF for the sum of $260,000.00.  Plaintiff now seeks summary judgment against Defendants Lawyers Title Services and Belville in the amount of $466,432.46, plus prejudgment interest at the statutory rate, costs, and reasonable attorney's fees.

## II.    STANDARD OF REVIEW

According to Federal Rule of Civil Procedure Rule 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In order to determine whether a certain fact is material, " it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248

4

(1986).   Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.   "The inquiry performed is the threshold inquiry of determining whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   Id. at 250.

When determining whether to grant a motion for summary judgment, a court must view all of the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences that can be drawn from those facts.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).   When the moving party brings forth a proper summary judgment motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."   Fed. R. Civ.P. 56(e); see Anderson, 477 U.S. at 256 ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c).")

## III.   LEGAL ANALYSIS

### A.   Defendant Lawyers Title Services is Obligated to Pay Plaintiff According to the Terms of the Dishonored Check.

In Minnesota, when a check is dishonored, the person ordering the payment is obligated to make payment according to its terms at the time the check was issued.   Minn. Stat. §336.3-414(b). Defendant Lawyer Title Service issued a check to Plaintiff for $466,432.46 and the check was

dishonored.   Therefore,   Defendant Lawyers Title Service is obligated to pay $466,432.46 to Plaintiff.

**B.**     **The Corporate Veil of Lawyers Title Service Must Be Pierced and Liability Imposed Against Defendant Belville.**

Plaintiff asks this Court to pierce the corporate veil and impose liability against Defendant Belville for the liability of Defendant Lawyers Title Service.  Defendant Belville argues that this would be improper because ATGF and ATIF assumed his liability when they took control of his money and business records.  Defendant Belville's claim is not a defense to the Plaintiff's claim, rather it is the possible basis for a claim against ATGF and ATIF.  Therefore, the Court must look at the facts in the light most favorable to Defendant Belville and determine whether it is appropriate to impose personal liability for the liability of Defendant Lawyers Title Service.

Whether to pierce a corporate veil is determined by an application of state law.  Stoebner v. Lingenfelter, 115 F.3d 576, 579 (8th Cir. 1997)(citing Minnesota Power v. Armco, Inc., 937 F.2d 1363, 1367 (8th Cir. 1991)).

> Under Minnesota law, deciding whether to allow a corporate veil to be pierced requires a court to 1) analyze whether the corporation functioned as the mere instrumentality of the principals a party is attempting to reach by piercing the corporate veil, and 2) determine whether injustice or fundamental unfairness could occur if the corporate veil were left intact.

Stoebner, 115 F.3d at 579 (citing Victoria Elevator Co. v. Meriden Grain Co, 283 N.W.2d 509, 512 (Minn. 1979)).  The first prong is a determination of fact and the second determination is equitable. Stoebner, 115 F.3d at 579.

In determining whether the corporation functioned as a mere instrumentality, several factors are considered.  Victoria Elevator Co., 283 N.W.2d at 512.  The significant factors include:

insufficient capitalization for purposes of corporate undertaking, failure to observe

6

corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings.

Id.  If a number of these factors are present, then the Court looks to whether an element of inequity or fundamental unfairness exists.  Id.

Defendant Belville has not presented any evidence to rebut the evidence presented by Plaintiff that Lawyers Title Service was nothing more than a name for a bank account.  The evidence shows that Defendant Belville used Defendant Lawyers Title Service as a facade for individual dealings.  He was the only shareholder, director, and officer.  He used the funds held in the Defendant Lawyers Title Service account to personally profit by transferring the money to an account where interest would be earned by him, not Defendant Lawyers Title Service.  Defendant Belville also used money held by Defendant Lawyers Title Service to give himself a short-term personal loan.  Defendant Lawyers Title Service never profited from the closings, nor did it ever make any payments of any expenses.  Furthermore, Defendant Belville has not produced any evidence of corporate records or appropriate capitalization for Defendant Lawyers Title Service. In essence, Defendant Lawyers Title Service did nothing more than hold an escrow account for the closings conducted by Defendant Belville.  Therefore, the Court finds that Defendant Lawyers Title Service was a mere instrumentality for Defendant Belville.

Since it has been established that Defendant Lawyers Title Service was nothing more than a mere instrumentality of Defendant Belville, the Court must now determine whether inequity or fundamental unfairness would occur if the corporate veil is not pierced.  Plaintiff argues that it would be unfair to allow Defendant Belville to use Defendant Lawyers Title Service as a short term lender and profit from the interest earned on money held by Defendant Lawyers Title Service while

Plaintiff still has not been paid the $466,432.46 to which it is entitled. Defendant Belville argues that it would be inappropriate to look at his personal dealings with Defendant Lawyers Title Service because it did not create the shortfall in his account, which was caused by unfunded mortgages.

It would be fundamentally unfair for Defendant Belville to escape liability by hiding behind a corporation that was used for nothing more than a name on an account holding money in escrow for the dealings of Defendant Belville. Especially in light of the fact that money being held in escrow was used to his personal benefit and when it stopped benefitting him he closed the account and walked away. Since fundamental unfairness exists, the corporate veil of Defendant Lawyers Title Services should be pierced and liability imposed against Defendant Belville.[2]

## C.   Plaintiff Is Not Entitled To Attorney's Fees Incurred in Litigation With ATGF and ATIF.

Plaintiff requests attorney's fees from Defendant Belville because he forced them into litigation with ATGF and ATIF. Minnesota Law provides that "where the wrongful act of the defendant thrusts the plaintiff into litigation with a third person, the plaintiff may recover from the defendant the expenses incurred in conducting the litigation against the third party, including attorney's fees." Dworsky v. Vermes Credit Jewelry, Inc., 69 N.W. 2d 118, 124 (Minn. 1955). The Plaintiff has failed to show how the actions of Defendant Belville created a cognizable claim against ATGF and ATIF and forced litigation between these parties.

## D.   Prejudgment Interest

The award of prejudgment interest is governed by state law when state law is applied to the

---

[2]Since the Court imposes liability against Belville for the liability of Defendant Lawyers Title Service, it is not necessary to address Plaintiff's arguments that Defendant Belville is liable under the theories of conversion or unjust enrichment.

substantive claims.  <u>Northwest Airlines, Inc. v. Flight Trails</u>, 3 F.3d 292, 297 (8th Cir. 1993).

Minnesota law allows for prejudgment interest where the amount of damages is readily ascertainable

by computation.  <u>S.B. Foot Tanning Co. v. Piotrowski</u>, 554 N.W.2d 413, 420 (8th Cir. 1996)(citing

<u>Gand v. Jay Bros., Inc.</u>, 367 N.W.2d 645, 647 (Minn.App. 1985)).  Since the amount of damages in

this case has been readily ascertainable as the amount of the dishonored check, prejudgment interest

should be awarded under Minn. Stat. §549.09.

## IV.    RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED** and judgment

be entered against the Defendants Lawyers Title Service and Belville for $206.432.46[3] with

prejudgment interest as provided by Minn. Stat. §549.09.


DATED: June 28, 2007                              s/ *Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with
the Clerk of Court and serving on all parties, on or before **July 23, 2007**, written objections which
specifically identify the portions of the proposed findings or recommendations to which objection
is being made, and a brief in support thereof. A party may respond to the objecting party's brief
within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.
A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636
to review a transcript of the hearing in order to resolve all objections made to this Report and
Recommendation, the party making the objections shall timely order and cause to be filed by **July
23, 2007,** a complete transcript of the hearing.

---

[3]This amount represents the amount of the check $466,432.46 less the $260,000.00 paid
in the settlement with ATIF and ATGF.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.